Your Honor, these are cross appeals. My name is Craig Enoch. I represent Chris Weber, receiver in the underlying litigation. Daniel Alexander is here representing Tracy O'Reilly Kohlrautz, who ceded his time to me. And also sitting at the council table is Mandy Ford, who's been assisting me on this appeal. This case arises out of divorce, and if anything, divorces can be messy. One of the things that can be messy in a divorce is trying to determine what the assets of the marital estate are. Tracy O'Reilly Kohlrautz and Franz Kohlrautz were married for about 16 years, a little bit over 16 years. They had an international lifestyle. Franz Kohlrautz was an international businessman. Tracy currently lives in Texas, did live in Texas at the time the divorce was filed back in 1997 or 6 or so. One of the things that was set up at that time is Franz Kohlrautz defaulted in the divorce, but one of the things that the court was interested in was the fact that he did have an ability to move assets around, both internationally and within the country. Well, the divorce was where? In Texas, Your Honor. Divorce was in Texas. They had a long-time residence in Texas, but they lived in various places. Something happened in the Bahamas, too, right? Well, yes, Your Honor. They also had a home in Bahamas as well. Had a divorce in the Bahamas. Well, they had a divorce in the Bahamas, but the judgment on divorce was first rendered in Texas long before the Bahamian divorce decreed. And the assets were declared the possession of the receiver long before the Bahamian divorce. Where were the divorce proceedings first filed? In Texas, Your Honor.  By? By Tracy Kohlrautz. Tracy. And Franz Kohlrautz was served. He did not appear. Okay. But also the trial court. So just to get this down to the elemental level here. Yes, Your Honor. The divorce proceedings were first filed in Texas. The divorce decree first entered in Texas. Yes, Your Honor. All right. In California, Nevada, Texas, many states have the same mechanism in place where you have a judgment for divorce. You also have a judgment attempting to allocate assets. If you can't determine what the assets are, you will then establish a receivership to marshal those assets and have ultimately a determination of how those assets will be distributed. Where were the parties living immediately before the divorce proceedings were commenced? We're not sure where Franz Kohlrautz was living immediately before the divorce, but we know that Tracy Kohlrautz was living in Texas immediately before the divorce. So in this case, this really is a case of all my exes live in Texas. That's exactly right, Your Honor. Okay. So somebody claimed to be a Bahamian. Well, Your Honor, he was of German extraction. They happened to have a place in Bahamas. Tracy Kohlrautz was originally a Canadian. So this was an international couple. They lived in various countries, but they did have a long-time residence in Texas. It was not an unusual place to be filing for divorce in this case. Mr. Enoch, I know that you're well aware of the standard of reviews. And in this instance, there was a bench trial, and there were certain findings that would have been against your client about certain things that happened. And your client gave certain explanations as to why he felt it was appropriate to file the lease pendants and to take certain actions in Nevada. But then there was a contrary explanation that was, you know, presented to the court. How are you going to overcome that? I mean, that the court just basically didn't buy your client's explanation. Because there were, obviously, if the Texas court didn't enter a judgment against the Nevada properties, you know, why was it an abuse of discretion for the district court to find that Mrs. Kohlrautz and Weber committed an abuse of process and slander of title when they filed the lease pendants, the TRO, the complaint, based on their allegations that there was a Texas judgment when it wasn't in the Texas judgment? So how do you get past that? I think there's two points about this. One is the standard of review on the fact findings by the trial court is there has to be a definite and firm conviction that a mistake was committed. And we believe that's the case in the undisputed record in this case. Furthermore, on the question of law about the abuse under Rule 11, which is similar in the Nevada rule to the California rule. But the definite and firm conviction. I mean, I have a definite and firm conviction on a few things, on very few things in life. But one firm conviction I have is that apparently your client did not have a Texas judgment, as Judge Callahan just asked you, and proceeded to represent that he did. So how do you get around that? Well, Your Honor, I think if the issue is do you have authority to go after assets? The issue is not whether Oilman was a defendant. The issue is did Oilman receive? Was it the beneficiary of? Well, the answer is yes, you have the right to go against assets. But no, you do not have the right to lie, cheat, and steal in the process of collecting them. And here the question is, did you have a judgment? Answer, no. Did you represent that you had a judgment? Answer, yes. Now, if I'm wrong about that, you better disabuse me, because I don't follow your argument. Well, Your Honor, there is no question in this record that when you're rushing to chase after assets that you think are being dissipated, mistakes will be made. I do not believe the judge thought that there was malice by Chris Weber in this case because he didn't award any penalty damages. But I also think that there's two aspects. If you're chasing assets, you can go after and list penance for title to real estate when you say the possession of that real estate is one either purchased with community assets or the real estate existed. What do we know about this case? It doesn't matter about what he said. What do we know about the case? We know this property, this property was held by a marital asset in a judgment in the Texas case that was then sold to oil men. We know that that happened two months before the divorce decree. We also know that Franz Kollraths was the president of oil men before the divorce decree and stepped down the day after the property was transferred to oil men. We also know that the person who signed the deeds on behalf of Regency Crown, which was an asset of the estate, was Franz Kollraths Gardner. It says on the deed that he was president of Regency Crown. But the problem is, yes, those would all be things that you would litigate in the divorce proceedings, but apparently no court, whether it be the Bahamian or the Texas court, ever said that there was an interest in that Nevada property. In fact, it said to the contrary. Yes, Your Honor, but under Rule 11, the Federal rule says not simply do you have a reasonable belief after inquiry, do you have a reasonable belief that through discovery you will find the answer. The trial court in this case granted no discovery on the very issue that the trial court said we had no information on. Was Rule 11 applied to anything other than the complaint? Well, Nevada Rule 11, well, yes, Your Honor, because he did dismiss the claim in the district court, and he did award sanctions in the district court below. And the standard that he used in his order appeared to be coming from the standard of Rule 11, which is identical in Nevada rule. But the issue that was going on here is just after the divorce was filed, a lot of funds disappeared out of the Charles Schwab account. Which divorce? Pardon? Which divorce? In the Texas court. Funds disappeared from Schwab. There's a lot of discussion about a report that said we can trace the funds out of there, we know it was one of the companies that he controlled, we just don't know which of the accounts it goes to. And it was interpreted to say, well, since your advisor didn't know where it went, this was a frivolous claim, a meritless claim. Chris Webber always took the position, but I thought through discovery we could find where those funds were traced, where those funds actually went to. But no discovery was permitted. Let me ask you a quick question, because there is a cross appeal, and, you know, so you've got two hats on here. Sure. It would seem that the district court, in its denial of attorney's fees, pretty much went pretty short shrift on we don't know exactly why the district court didn't allow certain things. Why would you say that the district court order was sufficient? Because, obviously, they were claiming a lot more. There's not much of an explanation. There might be an explanation, but it's not very much in the record. Well, Your Honor, they actually filed the first appeal claiming that they were entitled to more, and we came as cross appellants on the other issues. Attorney's fees, as an example, David Willard was their witness. He said, I had $300,000 in attorney's fees expenses, but there was no additional evidence about the reasonableness and necessity of the fees. Their response was, well, it's just unchallenged. But this Court's authority says that even if unchallenged, there's still a primary burden on the part of the person seeking attorney's fees to prove the reasonableness and the necessity of the fees. So I think that was the basis for the judge's decision not to award additional attorney's fees. Additionally, on the punitive damages, a reading of this record will show that mistakes were made. A reading of this record will show that the receiver is rushing to try and capture assets that are known to be distributed in other companies. And the receivership had the benefit of a transcript from an English proceeding where the question of ownership of oil men was in the record, and the question of whether Franz Kollraths was still exercising control over oil men prior to the divorce that was going on, that I believe gave them reasonable belief to move forward. I think the judge concluded whatever decisions they were making, it was not the appropriate way to proceed against the assets. I think the judge concluded that he overstepped his bounds. But I think the judge also concluded that there was not malice here. I think the ---- Let me ask just a real quick question on oil men. Who is oil men? Did you claim somehow that it was a wholly owned asset or a shell for the husband or ---- Describe oil men from your perspective. Well, it's described in the record as a shell corporation. I would describe it as a shell corporation. It existed in corporate form with no existing assets. But if we pierce the veil, who was hiding behind the black curtain? There's no question Franz Kollraths was the sole director and the officer of that until the day after the deeds of property from one of his companies to oil men was transferred. So I shouldn't take any umbrage then and get upset emotionally or ethically over the claim because the truth is that the husband just was using all these little shell corporations to hide assets from under your version of things. No, no. I don't think I described it. I'm saying don't take umbrage to it. The issue is, was there a reasonable belief that there was a claim here to the property that oil men received from one of Kollraths' companies to the other that clearly was transferred during the marriage and actually right at the marriage? So I think that's the question, was it reasonable to believe that. The Court holds no probable basis for determining that oil men property belonged to the marital assets, and I do believe that based on this record, what they knew and what was before the trial court, you could form a firm conviction that that was a mistake. I want to remind you that you have the 15 minutes that covers both the appeal and the cross appeal. So if you want to save some time in order to. But what about the other, the Kollraths, I mean, Kollraths, was she going to use any time? No, Your Honor. She ceded it to me. They're primarily arguing the same points that are there, and I did want to reserve three minutes on my rebuttal. But we did talk a little bit about the Mahaney judgment. I'll talk about that later. Okay. We will. We will give you three minutes on your rebuttal. Thank you. May it please the Court. I'm Ken Hogan here on behalf of Oilmen Participation Corporation, which is a Liberian corporation that did hold properties in as part of the whole confusion, did hold properties in Nevada. Straight face test. There you go, Your Honor. What had happened was this was a corporation that was set up by Mr. Kollraths and was held as a shelf corporation through. As a shelf. Shelf. Shelf corporation. You're saying shelf, not shell. Correct, Your Honor. Oh. I misunderstood. Like on the shelf. Right. It was. You claim it wasn't a shell. That's correct, Your Honor. But who owned it? Franz Kollraths owned it up until David Willard bought it. Well, wait a second. Just, I mean, with relationship to the divorce, help us here a little. Don't try to hide the ball from us. I'm not at all, Your Honor. The issue was that it was on the shelf. It was used in terms of money transfers during the marriage. But as of the time that the marriage occurred. And who owned it then during the marriage? Franz Kollraths. All right. And it was used by Franz Kollraths during the marriage. Yes, Your Honor. To put things in and out of. Yes, Your Honor. And as of the time that the divorce occurred. And, in fact, as of the time of the filing in the Texas court, Mrs. Kollraths did testify that she knew of no assets in it at that time. It was, in fact, empty at that time. And it was sold to David Willard, who is another Bahamian, who intended to use that corporation for land developments. And why didn't he start his own? Why did he not start his own? Because it was already registered. It was already set up. It was just an easier process. Was that a BFP? Was he a bona fide purchase for value? Yes, Your Honor. Yes, money did change hands. And he did actually pay Mr. Kollraths for that corporation for the registrations and everything that has been set up. So did she get half of that? That I don't know, Your Honor. Okay. Well, I mean, there is a little, you know, there's a little aura of suspicion as to Mr. Kollraths in terms of, like, trying to move everything around. But, you know, I guess the issue, just like I asked Mr. Enoch, in terms of the Court did a bench trial on this, and obviously, you know, the explanations of both sides were heard. So regarding factual findings, we have to look at those. But I would say you would have the same problem on punitive damages that he would have on the other factual findings. The Court heard it all and said, yeah, they were rushing to try to get things, yeah, they were wrong, and that's why I'm holding them responsible, but I don't consider it malicious. So how do you overcome that? Well, a couple things, Your Honor. First of all, the Texas decree was a default. The Bahamian decree was on the merits. Everybody involved, everybody relevant appeared. Mrs. Kollraths. Well, I guess the question, and I'll ask Mr. Enoch this, but if we determine the district court should not have recognized the Bahamian judgment, what effect, if any, would that have on the district court's findings regarding abuse of process? How does that figure in? I mean, obviously, what do you lose if we say that the court shouldn't have recognized the Bahamian? I don't think we lose anything, Your Honor, in that if that's decided now it doesn't go to the state of mind that should have been present in the appellees at the time that they commenced this Nevada action. Well, tell me what their argument is. They obviously think that it's important to say it shouldn't have been recognized. They obviously think it makes a difference. Well, I think if the Bahamian judgment is not recognized as to Oilman, then the district court's dismissal of their claims back in June of 2003 would have been an error. Okay. But I don't think that's relevant in that, first, everybody did appear. It was not a default. And if you look at the issue of comity and reciprocity, the restatement, Section 98, does say that valid judgments should be afforded reciprocity, but then comment A. Restatement of judgments? Restatement of conflicts, Your Honor. It doesn't. Comment A to Section 98 does say that only non-defaulted judgments would be given reciprocity. In other words, the United States policy is not to necessarily recognize defaults. And Judge Lucero brought up earlier, is it possible to default jurisdiction, default your way into jurisdiction? Well, it's possible for a court to issue a default order, but when it's challenged, as it was here, when Texas appeared in the Texas court to challenge jurisdiction, if that's not adjudicated, if there is an order on – if there had been an order affecting Oilman, it would have been set aside. I'm not sure I agree with all of that. But help me out with the chronology here. The filing for a – the first divorce filing was in Texas? Yes, Your Honor. December of 2000 – or, I'm sorry, 1997, Mrs. Kohlrautz filed in Texas. Two weeks later, Mr. Kohlrautz filed in the Bahamas. In the Bahamas. And there had been – when was the default judgment in Texas? In December of 1999, I believe. One footnote, if I may, Judge Schroeder. When was the defendant served, the Texas proceeding? Yeah. That is still an issue. We're not certain he was ever properly served. Well. The default decree was – the filing was in September, September 19, 1997, and the default decree was December 1, 1997, in Texas. The default was December 1, and then the Bahamas was filed when? The Bahamas was filed prior to that, September 30 of 1997. Okay. So – and she was served in the – in the Bahamas? Yes, Your Honor. And appeared. And appeared. Yes, Your Honor. And nobody made reference in those proceedings to the Texas proceeding? There were references to the Texas proceeding. There was some question in the Bahamian court's mind as to whether Franz was actually subject to jurisdiction in Texas. And going back to Judge Lucero's question earlier, the couple had married in Luxembourg. They then moved to the Bahamas and lived there for seven years. Mrs. Corout's father was ill in September. She went home to Texas to visit him, stayed there long enough to get the requisite jurisdiction time and filed for divorce. She expected Franz to follow her over. He never showed up. The divorce proceeded. So the couple had lived and maintained a residence in the Bahamas. That was their primary residence. And that was one of the issues that the Bahamian court addressed. Oilman then intervened in that Bahamian proceeding. So you had Mrs. Corout's, Mr. Corout's, and Oilman all present in that case, nobody present in the Texas default. What did the Bahamian court make an effort to determine the or trace the assets that Oilman owned at the time of the claim slander of title? Say that last part again. At the time of the claim slander of title as against Oilman's participation corporation? Yes. The issue was that there had never been any monies tracked through I mean, there were several theories that came out with regard to Mrs. Corout saying that monies had flowed. First, it was Segale S.A., which was actually named in the original decree. That didn't pan out. Then it became Regency Crown. But the Bahamian court did look at all those and found not only was Oilman not a marital asset, but specifically that Regency Crown was also not a marital asset. I understand. But my question was did the court inquire as to or seek to trace the assets that flowed into Oilman to make sure that that was bona fide? That is to say that they were not being concealed assets to avoid distribution. I don't know specifically what the Bahamian court looked at. I only know what the Bahamian court held. So there were never any issues regarding assets ever litigated in Texas, I take it? No, Your Honor. What happened was there was a decree in 1997, and then there was what they titled a Supplemental Petition in Aid of Enforcement that was filed. And that was April 1999, not April, February of 1999. One of the issues is did the court have personal jurisdiction over Oilman? Wait. That was filed in what? In February of 1999 in Texas, before the same Texas Divorce Court. But the Texas Divorce Court had lost plenary power 30 days after the final decree in 1997. This new petition attempted to name Oilman. And that goes back to the questions earlier that the court was asking with regard to how do we deal with this issue of punitive damages. If they really believed that the 1997 decree provided jurisdiction over the assets of Oilman in Nevada, why did they go back in 1999 and try to name Oilman in a completely different proceeding? Well, it was the same proceeding, but new claims, trying to name new parties in a final divorce. Why would you do that if you thought you already had jurisdiction? They knew they didn't have jurisdiction. And if you go and look at his fee entries. Well, because in the law, everything, nothing's ever, you know, it's how my lay people always say, well, if the law says this, well, why isn't that the end of it? Because judges say different things because courts say different things, and so people try to cover all their bases. Indeed, but, and we don't necessarily have an objection to trying to cover your bases, but when you try to cover your bases in February of 1999 and the party shows up to contest jurisdiction, what would a careful receiver do? A careful receiver would adjudicate that in the Texas court. What he did a month later, he started a completely new action in Nevada. So we've got oilmen chasing this issue through the Bahamas, through Texas, and when we appear in Texas to challenge the court. The court found he wasn't careful, but the court also found that he didn't rise to the standard of punitive damages. Well, the issue with the court's holding, Your Honor, was that the finding says that the level of malice didn't rise to the level of punitives, and that's really not the way the Nevada statute is structured. The Nevada statute says that if there is malice, and it can be through either fraud or recklessness, and here I think we have both, there is malice. And if there is malice, punitives fall. So you're saying it's a legal issue, not a factual issue, because on a factual issue you would lose. I don't think we would lose on a factual issue, Your Honor. I think there is evidence. Well, you might with me if it's a factual issue. So a legal issue would be better. I think if you have a finding, and there is a finding, that they acted recklessly, they brought groundless vexatious claims, they made false statements and misrepresentations to the court, then you have malice. Then punitive damages may follow, not shall follow, right? Absolutely, Your Honor. All right. The statute is permissive. But what do you want us to do with the may? We don't have the power to exercise that discretion. What's our standard of review on may? Standard of review on an error of law. Well, that's the way to say it. That's not necessarily an error of law. It's an exercise of discretion. Well, I understand, Your Honor, but, and this goes back to the previous comments of the Court, I don't think we're going to get around the factual issues. I mean, if this is not a matter of law, then I think we lose that issue. Can I, since we don't have too much time left, I want to talk about attorney's fees. And my understanding, Mr. Hogan, is that Mr. Enoch's taken the position that you just didn't meet your burden here. What's your response to that? Obviously, the record isn't, we don't have a lot to go by in terms of why the trial court did what it did. So what's your position on this? This is a rather unusual case in that first you have a claim or a set of claims that was brought, and then those claims actually are the defenses. They're the same thing. We were authorized by the Court. We had sufficient evidence. It's the same thing. Well, over here What more did the Court have to do? I mean, obviously, the Court heard the whole thing. I think the Court probably had a belly full of both sides and made certain determinations about what the Court believed here and had sort of this holistic sense of what the Court thought that this was worth. But what more did the Court have to do in order? Abusive discretion is the standard, and that's a pretty hard rock to push uphill. What more did the Court have to do that would require a remand on this? Because the best you could do on that would be a remand. Yes, Your Honor. We'd have to go back and determine. And the courts then might be able to shore the whole thing up, and that would be the end of it. I believe so. Anticipating Judge Lucero's next question, isn't this permissive? Yes, it is also permissive, but it's permissive within guidelines. And Alaska Pipeline says that if there's a sufficient or a substantial state policy stated in the law, then you're supposed to follow it. And in Nevada law, it says that that statute, the permissive fees for meritless defenses, should be granted and should be construed liberally in all cases that it fits. So you're saying the Court needed to roll up its sleeves and get more into the dollars and cents of that, and why not? I think your question earlier, actually, you had asked, why do you think the Court didn't give any fees beyond that certain point, beyond the point where they dismissed the first claims? And I think the answer is that he was a little irritated hearing a divorce case that was probably better heard in Texas or was better heard and had been heard in the Bahamas. And when he dismissed that, when he dismissed their claims, he was essentially telling them, your defenses don't have any merit either. I think that's not quite fair to the Court. I mean, that doesn't credit what the Court said. The Court said that the only adequate proven damages were up to the time of the court order. So, number one, prove that he concluded, at least implicitly, that the additional damages, attorney fees, had not been proven, and that attorney fees for pursuing the claim against Weber and Kohlrutz are not recoverable as damages. And I think that second one there is the error, Your Honor. They are recoverable as damage under the Nevada statute when you have a meritless defense. And I think the defense had been adjudicated in June 2003 as meritless. And, in fact, William and offered to withdraw with prejudice, voluntarily dismiss with prejudice. They refused. We had to go forward with the case. So ---- What about the fact they weren't proven? Well, it wasn't proven, Your Honor. Well ---- Oh, that the damages weren't proven. Your time is up. I'm sorry. I don't want to ---- Yeah, we're kind of in Hermann's land here. All right. Thank you. We're giving you a little extra time as well. Thank you, Your Honor. Very quickly, I want to address the Bahamian ruling. One comment ---- Why don't we stay on attorney fees for one second? Yes, Your Honor. Is it your contention that the additional attorney fees were not proven? Yes, Your Honor. According to the Federal standard of attorney's fees, or even Nevada's, where the reasonableness and necessity of the fees ---- In what way was the proof deficient? The only evidence that we see in the record is where David Willard, the President of Oil Men, says, I paid $300,000 in attorney's fees, but no tying of those fees to being reasonable and necessary to prosecute this. What we had is a bifurcated system. We had the trial court's decision adopting the Bahamian judgment, saying, Weber and Colroutz, your claims are out. And then some period of time later, they came back for a hearing on sanctions, and most of these fees were the result of preparing for the hearings on sanctions. And I think that's where the Court was going down on what was up to the point of the Court's ruling on the merits. But we don't think there's any evidence that it was reasonable and necessary after that on those fees. And the case authority says that that's their burden to begin with, irrespective of whether there's a challenge. Well, except we know there were other proceedings. I mean, it couldn't just be over. They couldn't just go home. There were other proceedings. So why, you know, why? I mean, the Court may well have – the Court didn't say much. It's hard to know what was in the Court's mind. That's correct, Your Honor. And I think I've given about as reasonable an understanding as maybe anybody else could where the Court was going on it. Okay. I wanted to say one thing. If you're litigating possession of real estate, I'm not aware of any State that would permit a sister State's court to determine the rights to title and possession. You must go to the home State where the real estate is. So I think it's a bit of a red herring to say, well, this should all have been litigated in Texas. On the Bahamian judgment, the Bahamian judgment did two things. One is it disregarded the Texas judgment that the receiver was entitled to go after mutations of marital property. Wait a second. Could you back up one step, please? Yeah. What did you just say? You're saying that the court with jurisdiction over the divorce should not enter orders dividing all marital property? Your Honor. You have to have segmented proceedings in other States to do that? I should explain. As between the husband and wife, of course the divorce court can order them to transfer title. But if you're chasing an asset that's gone into a third party's hands, as an example, title to real estate, and you're going to go challenge the title to real estate, State courts are very jealous about them having the right to determine title to the property in their State. That's all I was meaning to imply. If it's already gotten out of the hands and I must now go find someone else to effect that transfer, that was the point I was trying to make. The Bahamian judgment expressly said that it found these companies that the Texas court said were alter egos, or Cole Routes was the alter ego of, was not the alter ego. So we have a directly competing Bahamian judgment that's out there. Second of all, I think it's a red herring to say all the parties were before the Bahamian court because the receiver who's been invested with possessory interest was not a part of the Bahamian. He tried to be, but was left out. Thank you. You've more than used your time. We've been generous.
judges: Lucero, Schroeder, Callahan